FAIR, J.,
for the Court:
¶ 1. This is an appeal from a jury verdict in a drainage case. Michael Dodson was awarded $170,000 for flood damage stemming from the paving of adjacent property owned by Champion Chrysler.[1] Champion appeals, and Dodson cross-appeals. Finding no error, we affirm the trial court’s judgment.
FACTS
¶ 2. Champion and Dodson owned adjacent properties on Pass Road in Gulfport. In 2001, Champion expanded its car dealership by filling and paving approximately 1.8 acres of previously undeveloped lowland on its lot. The lowland was adjacent to Dodson’s property, and it had operated as a natural detention area, absorbing rain and holding runoff from surrounding areas. There was a ditch through the 1.8 acres that held excess water and drained it through a culvert under a warehouse building on Dodson’s property. About a year before the Champion property was paved, Champion’s predecessor in title granted the City of Gulfport a drainage easement over the ditch and surrounding area. The City placed a pipe with several raised inlets in the ditch and tied it to the culvert under Dodson’s warehouse.
¶ 3. Before it was paved, the 1.8 acres was graded and filled significantly in places. In addition to the fill dirt, the asphalt paving and limestone base added about six inches to the elevation. Overall, the Champion property was raised between three and five feet at some points along Dodson’s property line. The contractor testified that he graded the Champion property so it would drain into the inlets installed by the City.
¶ 4. The paving eliminated water retention on the Champion property and left the surface impervious, increasing runoff onto Dodson’s lot. Dodson’s warehouse building, also used as an HVAC fabrication facility, was located near the property line. It stood in the natural course of drain flow, but the drain pipe under the building had always been sufficient to carry away runoff when Champion’s 1.8 acres was in its natural condition. After the paving, the warehouse began flooding during heavy rains— approximately seven or eight times per year. This caused extensive damage to the building and prevented it from being used for either storage or manufacture of HVAC components. Dodson testified that he also lost equipment and stored materials during the first flood, which he valued at $20,169.13. His appraiser, Mike Garvey, testified that the flooding had diminished the Dodson property value by either $144,000 or $157,000, depending on the approach used to value the property prior to the flooding.
¶ 5. Dodson contended Champion was liáble for the damage to his property because it had unreasonably altered the natural drainage. The jury agreed and returned a verdict for $170,000. Champion appeals, and Dodson cross-appeals.
DISCUSSION
¶ 6. On direct appeal, Champion enumerates eighteen issues. For the purposes of *1102 clarity and economy we have consolidated some of them.
1. Mistrial
¶ 7. Dodson filed this lawsuit in January 2003. In 2007, the first trial ended in a mistrial. This appeal followed a second trial, which was held in September 2010.
¶8. Champion now contends that the trial court erred in granting the 2007 mistrial. According to Champion, the trial court had no good reason to grant a mistrial and, in the process, denied Champion the advantages it had gained during the first trial. Without any real supporting argument, Champion contends that the original trial judge, the Honorable Jerry Terry, must have been biased in favor of Dodson, whose wife is the Honorable Lisa Dodson. Judges Dodson and Terry served as circuit judges in the same district. We note, however, that Champion offered no objection to Judge Terry presiding over the trial until after the adverse ruling.
¶ 9. Further discussion of this assignment of error would be academic, as the subsequent retrial has left this issue moot. Interlocutory rulings of the trial court that are rendered moot by a subsequent trial on the merits cannot be appealed. See Gibson v. Wright, 870 So.2d 1250, 1254 (¶ 8) (Miss.Ct.App.2004). Even if We were to find that the trial court erred in granting the mistrial, we do not see how any relief can be afforded as the case has already been retried before a different circuit judge and a different jury.
2. Admissibility of Dodson’s Appraisal
¶ 10. In its second issue, Champion contends the trial court erred in admitting the testimony of Mike Garvey, Dodson’s appraiser. Garvey determined the values of Dodson’s property before and after it began flooding. His status as an expert in real-estate appraisal and the relevance of his testimony are not disputed. Instead, Champion attacks the methodology employed by Garvey, specifically his appraisal of the after value. According to Champion, Garvey’s opinion should have been excluded by the trial court under Gulf South Pipeline Company v. Pitre, 35 So.3d 494 (Miss.2010).
¶ 11. In Pitre, the Mississippi Supreme Court recognized that there are three accepted methods for determining the fair market value of real property: “(1) the cost approach, (2) the income-capitalization approach, and (3) the market-data or comparative-sales approach.” Id. at 498 (¶ 6).
¶ 12. Pitre was an eminent domain case where land was taken for a buried gas pipeline. The expert there used the comparable sales method to determine the value of the property in its before condition. The specific issue was the diminution in value of the portion of the property that was not taken, i.e., how the presence of the pipeline would affect the market value of the rest of the property. This is determined by the “before and after rule,” which is generally used to value damages for permanent injury to real property. See Copiah Dairies, Inc. v. Addkison, 247 Miss. 327,153 So.2d 689, 693 (1963).
¶ 13. The expert in Pitre first appraised the property before the taking, then assigned diminution percentages to the remainder not taken for the pipeline— twenty percent for the house, fifteen percent for the land, and so forth. Pitre, 35 So.3d at 496-97 (¶ 2). In setting these values, the appraiser “offered no pretense that he was following any recognized method or procedure acceptable in the appraisal industry, and he admitted he was not relying on peer-reviewed articles or industry publications.” Id. at 499 (¶ 9).
*1103 His testimony that there were no comparable sales of property affected by buried gas pipelines was contradicted both by the record and judicial knowledge. Id. The supreme court concluded that the expert’s opinion was “purely subjective, little more than rank speculation.” Id. at 499-500 (¶ 10). “Where an expert admits that no basis satisfying the accepted criteria for that profession exists for an opinion, the opinion should be excluded.” Id. at 499 (¶10).
¶ 14. In this case, Garvey admitted to no unreliability or arbitrariness in his methodology.[2] Garvey testified that he followed the familiar “before and after rule,” appraising Dodson’s property, first as if it were not flooding and then in its actual condition. Based on his inspection, Garvey concluded that the warehouse building was unuseable. He also found that the land under the building, because it flooded regularly, could no longer be put to productive commercial use. Garvey assigned that land a nominal value of $500. He then recalculated the value of the property without the contributing value of the building and flooded land, and concluded the Dodson property had lost $142,000 in value under the sales comparison approach.
¶ 15. Champion takes issue with this methodology. Its contention, first and foremost, is that Pitre requires an appraiser to find comparable sales. We do not agree. First, buildings, as opposed to bare land, can be valued through the cost approach (which does not rely on comparable sales). As to the underlying land, in Pitre, the supreme court discussed the diminution in value of an entire parcel based on its proximity to an underground gas pipeline. The adverse effect of the pipeline on the property value was said to stem from a subjective, perhaps irrational fear of the underground pipeline by potential home buyers. The expert in Pitre admitted that this could not be quantified in a scientific way except by comparable sales, which he did not employ, even though there was both evidence in the record and judicial knowledge that comparable sales existed and could have been used. In today’s case, Garvey did not use comparable sales of flooding land. However, he testified that the portion of the land that flooded could not be used for the commercial purposes that constituted the highest and best use of the overall lot. The flooded area made up only about ten percent of the total property. Garvey concluded that it would therefore contribute no value to the lot and that the value of the overall property could be determined by comparing its usable portion to sales of land that did not flood (i.e., the same com-parables that were used for the “before” comparison). Thus, Garvey did use comparable sales for the land portion of the analysis — the real question presented by Champion is whether they were comparable enough.
¶ 16. “The trial judge has wide discretion in allowing testimony of comparable sales, and [the Mississippi Supreme Court] encourages the judge to allow liberal cross-examination to permit testing of the true utility of the comparable sales.” Miss. Transp. Comm’n v. Fires, 693 So.2d 917, 923 (Miss.1997).
¶ 17. We agree with Champion that there could be some doubt as to the reliability of Garvey’s methodology. In our judgment, however, Garvey’s methods are not as manifestly arbitrary as those em *1104 ployed by the expert in Pitre. Also unlike Pitre, Garvey testified that he was following a methodology that is accepted and recognized by the appraisal industry. Garvey’s status as an expert in real estate appraisal was never contested.
¶ 18. We also admit that there is evidence to dispute Garvey’s conclusions regarding the extent of the damage to the building and the utility of the flooded land. However, the remaining utility of the property was a question of fact. To this end, the trial court gave the jury an instruction, offered by Champion, that it could not find the land and building to be a total loss if they still retained some use.
¶ 19. Champion has also contended that Garvey’s opinion should have been excluded because Garvey apparently was unaware the warehouse building’s carport was a recent addition, having been added around the time when the flooding began.[3] No authority is cited to support this specific proposition. Champion was free to cross-examine Garvey to bring this issue with his appraisal to the jury’s attention.
¶ 20. The “standard of review for the trial court’s admission or suppression of evidence, including expert testimony, is abuse of discretion.” Tunica County v. Matthews, 926 So.2d 209, 212 (¶ 5) (Miss. 2006). Having reviewed the record, we cannot conclude that it clearly shows the trial court’s decision to allow Garvey’s testimony was an abuse of discretion. In cases like this, it falls on the opposing party to convince the jury of the weaknesses in an expert’s approach. “Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.” Hyundai Motor Am. v. Applewhite, 53 So.3d 749, 754 (¶ 14) (Miss.2011) (quoting Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 596, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). This issue is without merit.
3. Directed Verdict
¶ 21. Champion next contends that the trial court should have directed a verdict in its favor. Its argument can be reduced to three major thrusts: first, that Dodson’s warehouse building caused the flooding by obstructing the natural course of drainage; second, that the City of Gulf-port’s easement for drainage over the Champion property made it responsible for the flooding damage; and finally that Garvey’s testimony before the jury (as opposed to voir dire testimony establishing credentials and methodology) failed to establish a sufficient basis for his appraisal.
¶ 22. In Hall v. Wood, 443 So.2d 834 (Miss.1983), the Mississippi Supreme Court tackled what it later called the “confused state of the law dealing with water and drainage cases.” See Miss. State Highway Comm’n v. Wood, 487 So.2d 798, 803 (Miss.1986). The court noted that its prior pronouncements were “not wholly consistent one with the other.” Hall, 443 So.2d at 840. Without belaboring the point, Champion relies on cherry-picked language from some of those inconsistent prior pronouncements. Acknowledging those cases, Hall establishes a “reasonable use” standard for property use and drainage:
[U]pper landowners ... are entitled to make reasonable use of their land. Where there is a reasonable likelihood of damage to the property of lower landowners, however, upper landowners are required to do whatever is reasonable to minimize the damage. The fact that some damage nevertheless occurs to the *1105 lower landowners does not render the upper landowner liable. On the other hand, where the upper landowner has done nothing in an effort to ameliorate the adverse effect on lower landowners and where the damage is in fact substantial, and further where the development activities of the upper landowner are a major proximate cause of that damage, the lower landowners are entitled to damages and/or injunctive relief as may be appropriate.

Id.

¶ 23. We review the denial of a directed verdict de novo. Windmon v. Marshall, 926 So.2d 867, 872 (¶ 20) (Miss. 2006). “If the Court finds that the evidence favorable to the non-moving party and the reasonable inferences drawn therefrom present a question for the jury, the motion should not be granted.” Entergy Miss., Inc. v. Bolden, 854 So.2d 1051, 1055 (¶ 7) (Miss.2003).
¶ 24. As Champion points out, the existing drainage under the Dodson building required Champion’s property to detain a significant amount of water in the event of a twenty-five-year rain — 2.4 acre feet before it was paved and 3.0 acre feet after-wards. However, the warehouse building predated not only the paving of Champion’s 1.8 acres, but, apparently, the paving of the rest of the dealership and other surrounding land that drained into the 1.8 acres and then under the warehouse building. There was lay testimony that before it was paved, the 1.8 acres was known to hold significant amounts of water that slowly drained through Dodson’s property. The 1.8 acres was described as natural detention area. Dodson’s engineer testified that Champion should have done a drainage study prior to the paving, and that if Champion had recognized the need, it could have constructed a detention system under the parking lot or arranged for additional drainage over an alternative route. There was also testimony that Champion did a poor job grading the lot to direct water into the piping installed by the City and that Champion had blocked some of the piping’s inlets.
¶ 25. We agree that Mississippi law does not place a burden on Champion to detain runoff. However, there appears to be no dispute that the Champion property naturally detained and delayed runoff. Under Hall, Champion’s right to alter the natural drainage or increase runoff from its land is qualified by the need to make a reasonable effort to minimize the resulting harm to lower landowners. Taking the evidence in a light most favorable to Dodson, we find a jury question as to reasonableness.
¶ 26. Champion also contends that the City of Gulfport had assumed responsibility for the drainage when it took an easement over part of the Champion and Dodson properties for drainage. However, the only authority cited by Champion to support this proposition concerns the maintenance and repair of easements. It has never been contended that the flooding was caused by disrepair attributable to the City. Instead, Champion argues that the City is solely responsible because the capacity of the drains was exceeded. We find no merit to this argument.
¶ 27. Champion’s final argument is that the jury had insufficient proof of damages because during Garvey’s testimony, he did not elaborate on the comparable sales used in his appraisal. There is no question comparable sales were used (and discussed at some length in Garvey’s voir dire), but Garvey was not asked to discuss them in any detail before the jury. Champion contends that this renders Garvey’s appraisal insufficient, *1106 but it has presented no authority holding that the details of the comparable sales must be presented to the jury; the cases cited by Champion only discuss comparable sales in general terms. There is “a presumption that the judgment of the trial court is correct, and the burden is on the appellant to demonstrate some reversible error to the appellate court.” Cobb v. Cobb, 29 So.3d 145, 152 (¶24) (Miss.Ct. App.2010). This issue is without merit.
4. Judicial Estoppel
¶ 28. In both trials, Dodson offered a list of items lost in the first flood. In the first trial, the court excluded Dodson’s list because it was unsupported by invoices and contained subjective or sentimental valuations of some items. In the retrial, Dodson produced another list, this time supported by invoices, but with some items omitted, some added, and significant differences in some valuations. Overall, the second list totaled about $7,000 less in losses. The second list was admitted into evidence.
¶ 29. Champion contends that the trial court abused its discretion in allowing the second list by rejecting the theory of judicial estoppel, which “is a doctrine of law applied by a trial court to a situation where a party asserts one position in a prior action or pleading but then seeks to take a contrary position to the detriment of the party opposite.” Miss. Power & Light Co. v. Coolc, 832 So.2d 474, 482 (¶ 22) (Miss.2002).
¶ 30. Judicial estoppel is not applicable to these facts. To begin with, the first trial was not a prior action, but an abortive trial of the same action — the same cause number, same parties, and so forth. Second, even if this were a different action with different parties, “the doctrine of judicial estoppel generally does not apply to false statements which were made without full knowledge of the applicable facts.... ” Beyer v. Easterling, 738 So.2d 221, 227 (¶ 18) (Miss.1999). “[Tjestimony given in a prior action does not estop the witness from testifying to the contrary ... where the former testimony was given by mistake or inadvertence or without full knowledge of the facts and is so explained by the witness.... ” Id. (quoting 28 Am.Jur.2d Estoppel and Waiver § 71 (1996)). Dodson attributed the differences to conservative estimates and an inability to locate supporting documentation for some of items he had lost.
¶ 31. When judicial estoppel does not apply, the opposing party’s remedy is cross-examination on the inconsistent testimony. That is exactly what occurred in this case. We find this issue without merit.
5. Valuation
¶ 32. Champion next attacks Dodson’s argument to the jury as to the amount of damages and the jury’s resulting verdict. Garvey testified that through his appraisal he concluded that the lost value of Dodson’s property was $144,000. While elaborating on his methodology, Garvey stated that he had done two valuations of the property in its “before” condition, one using comparable sales and one using the cost approach. The cost approach value was $13,000 higher than the comparable sales. Garvey testified that in his ultimate calculation of the lost value of the property, he had used the lower number, arriving at $144,000, because it was conservative. He gave no other reason for selecting the comparable sales value. Dodson’s attorney brought this difference to the jury’s attention on direct examination of Garvey, and he subsequently argued (over Champion’s objection) that the jury could find damages to the property of *1107 $157,000 based on the higher of the two “before” valuations. The jury’s verdict was for $170,000, which, considering the testimony of $20,000 in lost materials, is argued to have split the difference between the two estimates.
¶ 38. On appeal, Champion makes two assertions — first, that the trial court erred in allowing Dodson to argue for the higher value, and second, that the jury’s verdict is unsupported by the evidence because it exceeds the valuation chosen by Garvey. However, neither of these contentions is supported by relevant authority. Consequently, we find these issues procedurally barred and without merit.
6. Testimony of Land Purchase in Jackson County
¶ 34. Champion next contends that the trial court erred in allowing Dodson to testify that he had moved his business to property he purchased in another county. According to Champion, the testimony was unnecessary and prejudicial. But, again, no authority is offered in support, and this issue is barred as a result.
7. Jury Instructions
¶ 35. Finally, Champion challenges the trial court’s grant or denial of numerous jury instructions. We have already addressed the substance of several of these issues, but some arguments remain. Regarding our review, the Mississippi Supreme Court has held:
On appeal, [an appellate court] does not review jury instructions in isolation; rather, they are read as a whole to determine if the jury was properly instructed. Accordingly, defects in specific instructions do not require reversal where all instructions taken as a whole fairly — although not perfectly — announce the applicable primary rules of law. However, if those instructions do not fairly or adequately instruct the jury, [the appellate court] can and will reverse.
Peoples Bank & Trust Co. v. Cermack, 658 So.2d 1352, 1356 (Miss.1995) (internal citations and quotations omitted), overruled on other grounds by Adams v. U.S. Homecrafters, Inc., 744 So.2d 736 (Miss.1999). Jury instructions are within the discretion of the trial court. Davis v. State, 18 So.3d 842, 847 (¶ 15) (Miss.2009).

A. Instruction D-6

¶ 36. The trial court refused instruction D-6, which was offered to instruct the jury on Dodson’s duty to mitigate. However, the trial court gave D-15, which is a mitigation instruction that more accurately states the law in Mississippi. As the jury was properly instructed on mitigation, no error can result from the refusal of another mitigation instruction.

B. Instruction D-8

¶ 37. Next is D-8, which would have instructed the jury that it could not award attorney’s fees or a penalty against the defendants. Again, we find that the jury was properly instructed on damages when the instructions are viewed as a whole. In particular, P-10 informed the jury that it could award damages only for diminution in the value of the property and lost materials. D-5 reiterated the burden of proof as to damages, D-15 was a mitigation instruction, and D-16 instructed the jury that it could not find the land or building to be a total loss if they were still useable.

C. Instruction D-10

¶ 38. D-10 would have instructed the jury that it should find for Champion if Champion’s development of its property was not unreasonable. D-10 also contains somewhat confused verbiage on Champion’s theory of the case — its allegations re *1108 garding the role of the City of Gulfport in directing drainage and the pipe under Dodson’s warehouse building, some of which we have discussed above. We find that the jury was properly instructed on the reasonableness standard through other instructions, particularly P-20, which correctly quotes from Hall v. Wood, 443 So.2d 834 (Miss.1983).

D. Instructions D-12 and P-6

¶ 39. Champion also challenges the granting of P-6 and the refusal of D-12. Both of these issues rely on Champion’s arguments for a directed verdict, which we have already rejected.

E. Instructions D-13 and D-1U

¶ 40. D-14 would have instructed the jury that if it found the City’s role or the existing drainage “was a contributing cause to any damage” suffered by Dodson, the jury must return a verdict for Champion. This appears to be a contributory negligence instruction. The law in Mississippi is comparative negligence. Denham v. Holmes ex rel. Holmes, 60 So.3d 773, 780 n. 4 (Miss.2011). D-14 was properly refused.
¶ 41. D-13 was offered to instruct the jury that Dodson could not recover if “you find that any other intervening cause was the primary cause [of Dodson’s injuries] or was a greater cause than the actions and non-actions of [Champion].” This appears to be an effort to shoehorn Champion’s theory of the case into a superseding cause instruction. Since a superseding cause must, by definition, occur after the negligent act of the defendant, we find that the instruction does not correctly state the law in Mississippi. See Causey v. Sanders, 998 So.2d 393, 405 (¶ 38) (Miss.2008). And for the same reason, even a properly worded superseding cause instruction would not be supported by the evidence.
8. Cross-appeal: Punitive Damages
¶ 42. As his first issue on cross-appeal, Dodson contends that the trial court erred in directing a verdict denying his claim for punitive damages. Dodson argues that two facts entitle him to punitive damages: he told Champion beforehand that he believed their improvements would cause flooding and the fact that Champion pursued—and subsequently dropped—a counterclaim against him.
¶ 43. The Mississippi Rules of Civil Procedure and the Litigation Accountability Act provide remedies for the filing of frivolous claims, not punitive damages. See M.R.C.P. 11(b); Miss.Code Ann. § 11-55-5 (Rev.2002). Sanctions were not pursued against Champion. The other asserted ground merits more discussion. It was uncontested that diming the paving of the 1.8 acres, Dodson spoke with people from Champion on several occasions, warning them that he believed grading and paving its property would cause his land to flood. According to Dodson, his warnings, paired with the fact that Champion did not have a drainage study done before the paving, required the trial court to send the issue of punitive damages to the jury.
¶ 44. “Mississippi law does not favor punitive damages; they are considered an extraordinary remedy and are allowed with caution and within narrow limits.” Bradfield v. Schwartz, 936 So.2d 931, 936 (¶ 17) (Miss.2006) (quoting Life & Cas. Ins. Co. of Tenn. v. Bristow, 529 So.2d 620, 622 (Miss.1988)). “The kind of wrongs to which punitive damages are applicable are those which, besides the violation of a right or the actual damages sustained, import insult, fraud, or oppression and not merely injuries, but injuries inflicted in the spirit of wanton disregard for the rights of others.” Id. (quoting Summers *1109 ex rel. Dawson v. St. Andrew’s Episcopal Sch., Inc., 759 So.2d 1203, 1215 (¶ 52) (Miss.2000)). “In order to warrant the recovery of punitive damages, there must enter into the injury some element of aggression or some coloring of insult, malice or gross negligence, evincing ruthless disregard for the rights of others, so as to take the case out of the ordinary rule.” Id.
¶ 45. Thus, in deciding whether to put the issue of punitive damages before the jury, the trial court had to consider “the totality of the circumstances to determine if a reasonable, hypothetical trier of fact could find either malice or gross ne-gleci/reckless disregard.” Doe ex rel. Doe v. Salvation Army, 835 So.2d 76, 81 (¶ 17) (Miss.2003).
¶ 46. After reviewing the record, we conclude the trial judge properly directed a verdict denying punitive damages. Dodson’s theory of the case was that Champion should have consulted an engineer for a drainage survey before grading and paving its property. Dodson is not himself an engineer, and his warnings were just a lay opinion, albeit one proven correct in hindsight. There was drainage in place—it just proved to be inadequate. It cannot reasonably be said that failure to heed Dodson’s warnings amounts to malice or gross negligence. This issue is without merit.
9. Cross-appeal: Pre-judgment Interest
¶47. The final issue raised on cross-appeal is Dodson’s contention that the trial court erred in denying his motion for prejudgment interest.
¶48. A trial court may award prejudgment interest provided certain conditions are met, but is not required to do so. In re Estate of McLemore v. McLemore, 63 So.3d 468, 492 (¶ 75) (Miss.2011). “[P]rejudgment interest may be allowed in cases where the amount due is liquidated when the claim is originally made or where the denial of a claim is frivolous or in bad faith.” Id. (quoting Upchurch Plumbing, Inc. v. Greenwood Utils. Comm’n, 964 So.2d 1100,1117 (¶ 43) (Miss.2007)).
¶ 49. The trial court’s decision on prejudgment interest is reviewed for an abuse of discretion. Moeller v. Am. Guarantee & Liab. Ins. Co., 812 So.2d 953, 958 (¶ 11) (Miss.2002). In this case, the damages were unliquidated and the denial of liability was not frivolous or in bad faith. Under these circumstances the trial court did not abuse its discretion in denying prejudgment interest.
¶ 50. THE JUDGMENT OF THE CIRCUIT COURT OF HARRISON COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED ONE-HALF TO THE APPELLANTS/CROSS-APPELLEES AND ONE-HALF TO THE APPEL-LEES/CROSS-APPELLANTS.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, ROBERTS, CARLTON, MAXWELL AND RUSSELL, JJ., CONCUR.

. Dodson owned property, which was used by Eagle Mechanical Inc., a closely held corporation owned in equal shares by Dodson and a partner. Champion Chrysler was operated by Gulfport Capital LLC, on property owned by Mississippi Gulf Properties LLC. There is apparently some common ownership or control of the two. For convenience we refer to the parties collectively as "Dodson” and "Champion.”

. Champion makes much of the fact that Garvey called the nominal value of $500 assigned to the flooding portion of the land "arbitrary.” Since this is the nature of a nominal value, we do not see it as undermining his opinion.

. Dodson testified that he could not remember exactly when the carport was added.